# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ERNEST HUNTER, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 09-01491 (ABJ) |
| DISTRICT OF COLUMBIA, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Ernest Hunter brings this action against the District of Columbia alleging discrimination, retaliation, and a hostile work environment in violation of Title VII, 42 U.S. C. § 2000e *et seq.*, a claim under the D.C. Whistleblower Protection Act, D.C. Code § 1-615.54, a claim under the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq.*, and a claim under the Fifth Amendment for a violation of his due process rights. Defendant District of Columbia has moved to dismiss certain claims in plaintiff's third amended complaint. As explained below, the Court will grant defendant's motion.

I. **Background**

A. **Allegations from 2008**

Plaintiff, an African-American man, was a Contract Compliance Officer for the District of Columbia Child and Family Services Agency ("CFSA"). Third Am. Compl. ¶ 5. His responsibilities included making sure the CFSA Contracts and Procurement Administration ("CPA") complied with District of Columbia and federal contracting rules and regulations, assisting District of Columbia auditors, and making recommendations and developing practices

promoting efficiency and accountability. *Id*. ¶ 8. On July 1, 2008, plaintiff wrote a letter to Ronnie Charles, then Deputy Director of Administration of CFSA, "complaining about the lack of experience among staff in key positions; cronyism; gender discrimination in the application of CFSA's Alternate Work Schedule ("AWS") program; unprofessional, negative, and malicious behavior and comments from management; other discriminatory practices; and the lack of adherence to contracting rules and regulations." *Id.* ¶ 11. Plaintiff also alleges that Latonya Bryant, then Acting Program Manager of CFSA, abused her authority, such as allowing friends and associates within the CPA to come late to work and leave early without consequences, while advising Charles to deny plaintiff's AWS. *Id.* ¶ 14.

Plaintiff then wrote a second letter to Charles complaining about Bryant. *Id.* ¶ 15. This second letter resulted in a meeting on August 7, 2008, between plaintiff, Charles, Bryant, and Catherine Higgins, formerly Acting Contracts Administrator for the CPRA and Hunter's first-level supervisor, in which plaintiff complained about mismanagement and circumvention of CPA rules. *Id.* ¶¶ 12, 15. Plaintiff also informed Charles that Bryant demanded that two employees forge funding documents in anticipation of an audit, and that when they refused she forged the documents herself. *Id.* ¶ 15. Plaintiff also told Charles that he had filed a complaint with the Office of the Inspector General ("OIG"), at which point Charles informed plaintiff that he was to report directly to Bryant as opposed to Higgins. *Id.* Also at the meeting Bryant and Higgins allegedly disparaged plaintiff's work and accused him of threatening coworkers. *Id.*

The next day, plaintiff was ordered to attend a meeting during which Bryant allegedly accused plaintiff of behaving in a threatening manner during the August 7 meeting, and Bryant ordered plaintiff to take a fitness for duty exam at his own expense. *Id.* ¶¶ 17–18. Bryant also ordered plaintiff to surrender his identification badge, suspended his email account, and placed

him on paid administrative leave for ten days pending completion of the fitness for duty exam. *Id.* ¶ 18.

After he completed the fitness for duty exam on August 18, 2008, plaintiff returned from administrative leave and filed complaints and notices alleging discrimination and retaliation with the Human Resources Department of CFSA, as well as with the District of Columbia Office of Human Rights. *Id.* ¶ 19.

On August 7, 2009, plaintiff brought this action, *pro se*, against CFSA. Plaintiff amended his complaint on November 18, 2009. The first amended complaint named four causes of action: (1) employment discrimination in violation of Title VII; (2) retaliation in violation of Title VII; (3) hostile work environment in violation of Title VII; and (4) violations of the D.C. Whistleblower Protection Act. After filing this action, plaintiff received a right to sue letter dated December 10, 2009 from the Equal Employment Opportunity Commission ("EEOC"). Pl.'s Opp. to First Mot. to Dismiss [#11] at 2. Defendant CFSA then moved to dismiss [#9] the first amended complaint.

On May 11, 2010, the Court issued a Memorandum Opinion [#16] in which it dismissed plaintiff's hostile work environment claim because plaintiff did not allege "conduct sufficiently severe or pervasive as to constitute a hostile work environment." Mem. Op. at 8. But the Court concluded that plaintiff did state claims of discrimination and retaliation under Title VII, as well as a violation of the D.C. Whistleblower Protection Act, and denied the District's motion to dismiss as to those counts. Mem. Op. at 13. The Court also substituted the District of Columbia as a defendant for CFSA because CFSA is *non sui juris* and lacks the capacity to be sued. Mem. Op. at 5–6.

### B. Allegations from 2010

Still proceeding *pro se*, plaintiff filed a second amended complaint [#20] on June 20, 2010. On August 6, 2010, counsel entered his first appearance on behalf of plaintiff and moved to amend the complaint a third time [#27]. The Court granted leave to amend, and on November 4, 2010, plaintiff filed his third amended complaint [#28].[1] The third amended complaint re-alleged the original four causes of action: disparate treatment (Count I),[2] retaliation (Count II), hostile work environment (Count III), and violations of the D.C. Whistleblower Protection Act (Count IV). Plaintiff also added a cause of action for violation of the D.C. Human Rights Act (Count V) and for a violation of plaintiff's Fifth Amendment procedural due process rights (Count VI).

Plaintiff also added factual allegations throughout the third amended complaint describing acts that took place in 2010. Specifically, plaintiff alleges that on January 5, 2010, he received a poor performance evaluation by Tara Sigamoni, the Chief Contracting Officer of CFSA, and Jacque McDonald, the Contracts Manager of CFSA. Third Am. Compl. ¶¶ 20, 22–23. On January 21, 2010, plaintiff submitted a written rebuttal to Dexter Starkes, the Labor and Relations Manager for CFSA, refuting the performance evaluation. *Id.* ¶¶ 22, 24. On March 3, 2010, plaintiff sent a separate letter to Roque Gerald, the Interim Director of CFSA, complaining about the evaluation and "other transgressions" by Sigamoni. *Id.* ¶ 25.

In response to plaintiff's January 21 rebuttal letter, a meeting was held on March 9, 2010, between plaintiff, Starkes, Sigamoni, McDonald, and Wayne Enoch, a union shop steward. *Id.* ¶

---

1  The third amended complaint [#28] is incorrectly styled as the "Second Amended Complaint."

2  Plaintiff styled this cause of action as "employment discrimination" in his first amended complaint.

4

26. During the meeting, Sigamoni allegedly made unsubstantiated accusations about plaintiff's poor customer service. She also changed plaintiff's AWS to require him to come to work and leave work a half hour earlier because his AWS conflicted with the requirement to pay "night differential." *Id.* The attendees agreed that plaintiff would be compensated for the "night differential" that he was owed under his work schedule, and that he would be given a check for that amount. *Id.* Plaintiff eventually received a letter acknowledging the amount owed, but plaintiff was never paid that amount. *Id.* ¶ 29. In addition, McDonald allegedly agreed at the meeting to remove certain false comments from plaintiff's evaluation. *Id.* ¶ 26. The evaluation was eventually changed on March 16, 2010. *Id.* ¶ 27.

On March 31, 2010, plaintiff notified Sigamoni, McDonald, and Mr. Kopca, the Chief Financial Officer of CFSA, that a contract he had previously deemed to be non-compliant due to lack of funding and a missing signature now showed the signature of Higgins, and that Higgins had been allowed to sign the contract although there was still no funding. *Id.* ¶ 28. Sigamoni allegedly ridiculed plaintiff for broaching the subject with Kopca. *Id.*

In April 2010, plaintiff requested a meeting with Gerald to discuss the lack of integrity and ethics that he observed within the CFSA leadership. That meeting was held on April 28, 2010, between plaintiff, Gerald, Jim Toscono, the General Counsel, and Loren Ganoe, the Chief of Staff. *Id.* ¶¶ 24, 30–31. Plaintiff discussed an ongoing audit in which the auditors had cited CFSA for several violations that occurred during Higgins' tenure. *Id.*

On May 3, 2010, plaintiff contacted Ray Davidson, the Human Resources Manager, about a public document containing information about District of Columbia employees' salaries and tenure, which plaintiff thought was inaccurate. *Id.* ¶¶ 24, 33. Plaintiff's tenure date was listed as April 7, 2007, which was the date he started employment with the CFSA, as opposed to

the date he began working for the District of Columbia government 28 years earlier. *Id.* ¶¶ 7, 33. By contrast, the document allegedly listed start dates of Sigamoni's newly hired employees as the date they began working for the District of Columbia government. *Id.* ¶ 33. Plaintiff was concerned that this was a "Prohibited Personnel Practice" designed to privilege Sigamoni's newly hired employees in the event of a reduction in force ("RIF"). *Id.*

On May 6, 2010, Sigamoni and others informed plaintiff that he was being terminated due to a RIF and that he was being placed on immediate administrative leave. *Id.* ¶ 34. Sigamoni denied plaintiff's request to be allowed to share at a public meeting that his termination was in retaliation for his complaints against CFSA, and she demanded that he exit the building within twenty minutes. *Id.* She allegedly "emphasized that Mr. Hunter was to take along with him his pictures of Martin Luther King, Jr. and Rosa Parks." *Id.* Sigamoni soon returned to plaintiff's office with armed Metropolitan Police Officers, who allegedly attempted to search plaintiff's belongings and restrict his movements. *Id.* ¶ 35. While being escorted out of the building, plaintiff was allegedly subjected to the laughter and ridicule of the office assistant and Sigamoni's new hires, who were not terminated due to the RIF. *Id.* ¶¶ 35–36.

On November 4, 2010, plaintiff amended his complaint for a third time to add these new facts and certain legal claims. Defendant then moved to dismiss [#30] parts of the third amended complaint on December 3, 2010 pursuant to Fed. R. Civ. P. 12(b)(6).

**II.     Legal Standard**

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two

6

principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." 129 S. Ct. at 1949. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 1950.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*. at 1949, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002).

### III. Analysis

Defendant argues in its motion to dismiss that "(1) the new complaint does not cure the deficiencies in plaintiff's previously dismissed hostile work environment claim; (2) plaintiff did not exhaust his administrative remedies for Title VII claims that were not included in his original complaint; and (3) the new complaint does not assert a plausible Fifth Amendment violation."

Def.'s Mem. in Supp. of Mot. to Dismiss Certain Claims [#30] ("Def.'s Mem.") at 2. The Court agrees and will address each argument in turn.

### A. Hostile Work Environment under Title VII

Title VII is violated when a plaintiff demonstrates that the "workplace is permeated with discriminatory intimidation, ridicule, and insult" and that this behavior is "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). To establish a prima facie hostile work environment claim, a plaintiff must demonstrate (1) that he is a member of a protected class, (2) that he was subject to unwelcome harassment, (3) that the harassment occurred because of his membership in a protected class, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment, and failed to act to prevent it. *Jones v. GlaxoSmithKline, LLC*, 755 F. Supp. 2d 138, 149 (D.D.C. 2010), citing *Lester, v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003). Although a plaintiff is not required to plead a prima facie case of hostile work environment in the complaint, *Ali v. District of Columbia Gov't*, 697 F. Supp. 2d 88, 92 (D.D.C. 2010), the alleged facts must be able to support such a claim. *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 78 (D.D. C. 2007), citing *Sparrow v. United Air Lines,* 216 F.3d 1111, 1114 (D.C. Cir. 2000). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferences with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008); *see also Lester*, 290 F. Supp. 2d at 22 ("The key terms, then, are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work environment.") (internal citations omitted). The "conduct must be

extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). This standard is "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Id.*, quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

On May 11, 2010, the Court dismissed plaintiff's claim of a hostile work environment because the first amended complaint did not allege "conduct sufficiently severe or pervasive as to constitute a hostile work environment." Mem. Op. at 8. Plaintiff's third amended complaint seeks to revive that cause of action by alleging acts that took place more than seventeen months after the acts in the original complaint, but plaintiff's claim still fails.

As an initial matter, that seventeen month gap – in which nothing happened at all – suggests alone that the alleged events were not pervasive, as is required for a hostile work environment claim. *Lester*, 290 F. Supp. 2d at 33 (noting that "[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim" and that "it is not at all clear that mere reference to alleged disparate acts of discrimination . . . can ever be transformed, without more, into a hostile work environment claim."); *see also Nurridin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[T]he alleged events are temporally diffuse, spread out over a four-year period, suggesting a lack of pervasiveness."); *Rattigan*, 503 F. Supp. 2d at 79 (dismissing hostile work environment claim and noting how the comments were "spread out over a period of two years").

But even evaluating all of the facts from 2008 and 2010 cumulatively, plaintiff still fails to state a claim for hostile work environment. The allegations from 2010 – as described above – can be summarized as follows. On January 5, plaintiff received a poor performance evaluation from Sigamoni. Third Am. Compl. ¶ 23. On March 9, Sigamoni made unsubstantiated

9

accusations about plaintiff's customer service and changed his AWS, and plaintiff was not compensated for his "night differential." *Id.* ¶¶ 26, 29. On March 31, Sigamoni ridiculed plaintiff for broaching a subject with the Chief Financial Officer. *Id.* ¶ 28. On May 3, plaintiff complained about a public document that allegedly failed to credit his tenure from the time his employment with the District of Columbia began, as others were supposedly credited. *Id.* ¶ 33. Finally, on May 6, plaintiff was terminated due to a RIF, and was subject to ridicule as he was escorted from the building by police officers. *Id.* ¶ 34–35; *see also id.* ¶ 55. These acts, even when combined with the original 2008 allegations, are not pervasive, frequent, or severe enough to constitute an abusive work environment. *See, e.g., Holmes–Martin v. Sebelius,* 693 F. Supp. 2d 141, 165 (D.D.C. 2010) (holding that plaintiff's claims that she was publicly criticized, received unwarranted criticism in her performance evaluations, given reduced job responsibilities, excluded from meetings, and received unrealistic deadlines were not sufficiently severe or pervasive to support a hostile work environment claim); *Badibanga v. Howard Univ. Hosp.*, 679 F. Supp. 2d 99, 104 (D.D.C. 2010) (dismissing hostile work environment claim where plaintiff was placed on administrative leave due to a false accusation, his accent was criticized, he was told he was easy to replace with an American, and was told that his supervisor would not hire other Africans); *Johnson v. District of Columbia*, 572 F. Supp. 2d 94, 109–110 (D.D.C. 2008) (dismissing hostile work environment claim where plaintiff alleged he was not paid a promised pay increase, his responsibility was reduced, he was told he was "out of order" in inquiring about his reassignment of duties, and he was constantly ridiculed).

Moreover, plaintiff fails to allege facts that would plausibly suggest the necessary connection between the events he finds abusive and his membership in a protected class. *See, e.g.*, *Kelley v. Billington,* 370 F. Supp. 2d 151, 157 (D.D.C. 2005) (holding that to sustain a

hostile work environment claim, the plaintiff must show that he was discriminated against *because of* his status); *Jones v. Billington*, 12 F. Supp. 2d 1, 12 (D.D.C. 1997) (hostile work environment claim failed where plaintiff had "not demonstrated that any of the conduct of which he complains was related to his race, or that his workplace was permeated with racially discriminatory behavior. Only two incidents mention or relate to race at all."). Plaintiff pleads his own race and gender, as well as the race and gender of his coworkers and supervisors, without much suggestion of how he was discriminated against because of his status as opposed to any other, non-discriminatory reason. The Court is left to infer that each act was discriminatory or retaliatory simply based on the fact that he is a man, or that he is African-American, or both. This inference is especially weak given the fact the treatment he received from his coworkers came from both women and men, as well as African-Americans and non-African-Americans alike.[3]

The only fact pled that ties the acts to plaintiff's membership in a protected class is Sigamoni's alleged comment when she terminated plaintiff that he should "take along with him his pictures of Martin Luther King, Jr. and Rosa Parks." Third Am. Compl. ¶ 34.[4] While that comment may help demonstrate a hostile work environment claim, it does not on its own establish such a claim. *See Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840, 848 (D.C. Cir. 2001) (finding that one religious slander is insufficient to establish an atmosphere of hostility); *see also Harris,* 510 U.S. at 21 ("'[M]ere utterance of an . . . epithet which engenders offensive

---

3      The key supervisors whose behavior is at issue are Bryant (African-American female), Higgins (white female), Charles (African-American male), Sigamoni (Indian-American female), and McDonald (African-American female). *See* Third Am. Compl. ¶¶ 10, 12–13, 20, 21.

4      Plaintiff alleges that he wrote a letter to Charles complaining about gender discrimination in the application of the AWS program and "other discriminatory practices," Compl. ¶ 11, but the only fact in this allegation is that he wrote a letter – the remaining allegations are plaintiff's own characterizations of his work environment.

feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII"); *Bundy v. Jackson,* 641 F.2d 934, 943 n.9 (D.C. Cir. 1981) (finding that "casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action" under Title VII). For all of these reasons, the Court will dismiss Count III for failure to state a hostile work environment claim under Title VII.

### B. Exhaustion of remedies for Title VII allegations from 2010

Plaintiff's remaining Title VII claims are for discrimination and retaliation. Defendant argues that the new factual allegations in plaintiff's third amended complaint related to these two claims must be dismissed because plaintiff has failed to exhaust his administrative remedies. Specifically, defendant argues that even though plaintiff received a right to sue letter from the EEOC on December 10, 2009 concerning the events in 2008, the newly alleged acts occurred in 2010, after that letter was received, and they are therefore barred until plaintiff has exhausted his administrative remedies for claims based on those acts. Plaintiff counters that he "has not raised 'new' claims of violations of Title VII, but rather has bolstered his prior claims with subsequent acts evidencing discrimination." Pl.'s Opp. to Mot. to Dismiss [#31] ("Pl.'s Opp.") at 8.

Title VII "complainants must timely exhaust the[ir] administrative remedies before bringing their claims to court." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). The Supreme Court held in *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114 (2002), that discrete adverse employment actions individually trigger Title VII's procedural requirements. "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* The Court explained that "discrete discriminatory acts are not actionable if time barred, even when they are

related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113.[5]

Courts in this district have applied *Morgan* in holding that a plaintiff must exhaust his administrative remedies with respect to distinct acts that occurred after the filing of an administrative charge. *See*, *e.g., Taylor v. Mabus,* 685 F. Supp. 2d 94, 99 (D.D.C. 2010) (citing *Morgan* and holding that plaintiff failed to exhaust his remedies for discrete acts of discrimination or retaliation that occurred after the filing period); *Romero-Ostolaza v. Ridge,* 370 F. Supp. 2d 139, 149 (D.D.C. 2005) (stating that *Morgan* "has, on the whole, been understood to also bar discrete acts occurring after the time period, after the filing of an administrative complaint, when a plaintiff does not file a new complaint or amend the old complaint but instead presents these acts for the first time in federal court"); *Coleman–Adebayo v. Leavitt,* 326 F. Supp. 2d 132, 137–38 (D.D.C. 2004) (dismissing post-administrative complaint retaliation claim where the plaintiff failed to exhaust, and stating that there was "no reason" to treat post-administrative complaint retaliation charges "differently from other complaints of discrete acts"). "Requiring a plaintiff to exhaust each discrete claim of discrimination or retaliation 'comports with the purpose of the exhaustion doctrine to give the agency notice of a claim and [the] opportunity to handle it internally and ensures that only claims plaintiff has diligently pursued will survive.'" *Romero-Ostolaza*, 370 F. Supp. 2d at 149, quoting *Velikonja v. Mueller*, 315 F. Supp. 2d 66, 74 (D.D.C. 2004).

---

5      In *Morgan*, the Supreme Court held that a different rule regarding the statutory filing period applied to hostile work environment claims because those claims do not "occur" at a particular time. For hostile work environment claims, "as long as the employer has engaged in enough activities to make out an actionable hostile work environment claim," a plaintiff may use discriminatory acts that took place outside of the statutory filing period to prove the claim. 536 U.S. at 117. As previously described, however, plaintiff's third amended complaint does not state a claim for hostile work environment even when taking into account the 2010 factual allegations.

Here, plaintiff alleges discrete acts of discrimination and retaliation that took place in 2010 after he received his right to sue letter in December 2009. These events took place seventeen months after the acts in 2008 for which plaintiff had exhausted his administrative remedies: his placement on administrative leave and the imposition of a requirement that he undergo a fitness for duty exam at his own expense. In the interim, many of the 2008 supervisors left CFSA or were reassigned, and a different set of supervisors are alleged to have discriminated and retaliated against plaintiff in 2010. *See* Third Am. Compl. ¶¶ 10, 12, 13, 20, 21. So, not only are the new factual allegations separated in time, but they involve almost an entirely new set of supervisors and conduct of a different nature. The Court concludes that they are discrete acts and that any claims arising from those acts must be exhausted.

The Court will therefore treat plaintiff's third amended complaint as raising two separate causes of action for discrimination – from 2008 and 2010 – and two separate causes of action for retaliation from those years.[6] The Court finds that because plaintiff has not exhausted claims related to the discrete acts from 2010, those acts cannot serve as the basis for his discrimination and retaliation claims. The Court will therefore dismiss plaintiff's causes of action for discrimination and retaliation under Title VII relating to the 2010 acts.

## C. Fifth Amendment violation

In Count VI, plaintiff alleges that defendant violated his Fifth Amendment right to due process by "failing to hold a pre termination hearing at which time he could clear his name and terminating him in a manner which humiliated and subjected him to public scorn." *Id*. ¶ 70.

---

6   Plaintiff does not merely allege the 2010 facts as background for his complaint, but alleges these facts within each cause of action for discrimination and retaliation. *See* Third Am. Compl. ¶¶ 42, 49 ("Mr. Hunter was . . . issued a false performance evaluation, delivered his notice of termination in a confrontational manner by his supervisors, and degraded and humiliated by being escorted by armed Metropolitan Police Officers from the building in front of coworkers.").

Plaintiff makes no other Fifth Amendment allegations. *See Id*. ¶¶ 68–70. Defendant has moved to dismiss Count VI, arguing that plaintiff has failed to allege that his deprivation of Fifth Amendment rights was caused by a policy or custom of the District of Columbia as required under 42 U.S.C. § 1983. *See* Def.'s Mem. at 11.[7] Plaintiff counters that he does not have to allege his deprivation of rights was caused by defendant's policy or custom because he is not bringing this cause of action under section 1983. Pl.'s Opp. at 10–11. Instead, he argues his "Due Process claim . . . was brought under the Fifth Amendment, not § 1983." *Id*. at 11. *See also id*. ("Defendant has not cited any cases brought under the *Fifth Amendment* that require the plaintiff to show an injury resulting from a custom or policy of the government."). But there is no due process claim available to the plaintiff *other* than a section 1983 action.

The Court finds that under either construction plaintiff has failed to state a claim upon which relief may be granted. It is axiomatic under the doctrine of sovereign immunity that the government cannot be sued unless it explicitly consents. *See United States v. Mitchell*, 445 U.S.

---

7 Defendant also argues that plaintiff's due process claim is fatally flawed because he is required to allege facts showing that the process available to him – filing a post-termination appeal with the Office of Employee Appeals ("OEA") – was inadequate. Def.'s Reply in Support of Mot. to Dismiss at 4. Plaintiff counters that simply because he has a post-termination process through OEA does not mean he has no claim for a *pre*-termination denial of due process. In *Washington Teachers' Union Local No. 6 v. Bd. of Educ.*, 109 F.3d 774, 780–81 (D.C. Cir. 1997), the D.C. Circuit approved termination procedures that provide for only post-deprivation process where pre-deprivation process would have been overly burdensome. The Court agrees with plaintiff that the D.C. Circuit did not establish a *per se* rule that a plaintiff terminated in a RIF cannot challenge a failure to provide a pre-termination hearing, Pl.'s Opp. at 9, and that the issue is more appropriately resolved at the summary judgment stage. *See Washington Teachers' Union Local No. 6*, 109 F.3d at 781 (affirming district court's decision at summary judgment that pre-deprivation process would have been overly burdensome); *Int'l Union, United Gov't Sec. Officers of Am. v. Clark*, 706 F. Supp. 2d 59, 71 (D.D.C. 2010) (holding that "[t]here is no firm rule that termination procedures must be furnished at a specific time in order to be deemed Constitutionally adequate" and deciding at summary judgment that plaintiff was provided adequate pre-termination process). The Court therefore declines to decide whether plaintiff was owed pre-termination process at the motion to dismiss stage but instead will dismiss his Fifth Amendment claim on other grounds.

535, 538 (1980). Congress waived sovereign immunity for municipalities through section 1983. *Monell v. Dep't of Soc. Srvs.*, 436 U.S. 658, 690 (1978) ("Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies.").

If, as plaintiff argues, he was attempting to bring an action directly under the Fifth Amendment and not under section 1983, his claim is barred by sovereign immunity and must be dismissed for failure to state a claim.

The result is no different if plaintiff was attempting to bring Count VI under section 1983 because he has failed to satisfy the Supreme Court's test as promulgated in *Monell*, 436 U.S. 658. In *Monell*, the Supreme Court held "that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694; *see also Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2000) (holding that the complaint must state "a claim that a policy or custom of the District of Columbia caused the constitutional violation."). Plaintiff here has failed to plead any facts that would support an inference that a "custom" or "policy" of the District of Columbia was the "moving force of the constitutional violation." *See Monell*, 436 U.S. at 694. Indeed, he insists that he doesn't have to. *See* Pl.'s Opp. at 8 ("Second, Mr. Hunter is not required to show his injury resulted from a custom or policy of the District."). The Court therefore dismisses Count VI for failure to state a claim upon which relief can be granted.

IV. **Conclusion**

For the reasons stated above, the Court grants defendant's motion to dismiss certain claims in plaintiff's third amended complaint. Plaintiff's claims for hostile work environment (Count III) and for violations of his Fifth Amendment due process rights (Count VI) will be

dismissed for failure to state claims upon which relief can be granted. The Court also dismisses plaintiff's causes of action for discrimination and retaliation under Title VII relating to the 2010 acts. The counts that remain are: Counts I and II, for disparate treatment and retaliation under Title VII relating to the 2008 acts; Count IV for violation of the D.C. Whistleblower Protection Act; and Count V for violation of the D.C. Human Rights Act. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: July 15, 2011